IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | No. 1:19-cr-00213-RP |
| | § | |
| DONOVAN SMITH and | § | |
| BRANDI CAMPBELL, | § | |
| *Defendants* | § | |

**BRANDI CAMPBELL'S REQUEST FOR DOWNWARD DEPARTURE,
SENTENCING MEMORANDUM AND REQUEST TO FIND
18 U.S.C. §922(k) UNCONSTITUTIONAL**

Defendant Brandi Campbell requests a downward departure, and requests the Court to find 18 U.S.C. § 922(k) unconstitutional.

Defendant Campbell also requests that the Court impose a sentence of five years imprisonment, followed by no term of supervised release and no special assessment. The government is correct that Campbell does not have the ability to pay a fine. The sentence requested is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of 18 U.S.C. § 3553(a). The sentence requested will protect the public from further crimes of the defendant, afford adequate deterrence to criminal conduct, reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

The government seeks forfeiture of the firearms and ammunition identified in the Notice of Government's Demand for Forfeiture and Campbell does not oppose

1

that forfeiture.

In considering the sentence to impose, the Court must, first, properly determine the guideline range.

Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range. The U.S. Probation Officer did not identify any factors that would warrant a departure from the applicable guideline range, even though those exist. (PSR ¶ 89.) Campbell requests a downward departure.

Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance is warranted.

### Proper Determination of the Guideline Range

Campbell agrees with the U.S. Probation Officer that:

Base Offense Level USSG § 2K2l1(a)(4)(B)                    20
Campbell was a prohibited person and the offense
involved a firearm described in 26 U.S.C. § 5845(a).

Specific Offense Characteristic USSG § 2K2.1(b)(1)(A) applies        +2
and a two-level enhancement is appropriate because defendant
possessed a total of 5 firearms as charged in the Superseding Indictment.

For the reasons set forth below, Campbell disagrees with the Government that USSG § 2K2.1(b)(4)(B) applies and that a total four-level enhancement is appropriate because a firearm had an obliterated serial number, the Ruger, Model SR 40, .40 caliber pistol.  As shown *infra*, 18 U.S.C. § 922(k) is unconstitutional.

18 U.S.C. § 924(e) and USSG § 4B1.4 Are Not Applicable and the U.S.

2

Probation Officer Incorrectly Determined the Guideline Range

The U.S. Probation Officer determined that 18 U.S.C. § 924(e) and USSG § 4B1.4 are applicable in this case because she determined that Campbell has three prior felony convictions that qualify as a violent felony or a serious drug offense, which were committed on different occasions. (PSR ¶¶ 6, 29.) The U.S. Probation Officer incorrectly calculated the guideline range based on this determination. Campbell objects to the offense level of 34 identified in Paragraph 29 of the PSR based on the provisions of USSG § 4B1.4(b)(3)(A). Campbell also objects to Paragraphs 43, 69, 70, 72, 73, 74 and 75 of the PSR.

Campbell's objection is based on two reasons. First, Campbell is not subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) and USSG § 4B1.4 is not applicable because the government does not seek an enhanced sentence pursuant to the provisions of 18 U.S.C. § 924(e)(1), per the terms of the parties' plea bargain agreement. The government has not filed a Notice of Sentencing Enhancement as to Count Two of the Superseding Indictment. Accordingly, the maximum term of incarceration that Campbell is subject to in this case is ten years, followed by a term of supervised release of up to 3 years, a special assessment of $100 and a fine of up to $250,000.

The Court accurately informed the defendants of this fact during the rearraingnment/plea hearing held on February 25, 2022. (Transcript Rearraignment/Plea Hearing pp. 13-15.) During the rearraignment/plea hearing, the

3

Court stated that ... "my understanding of this plea agreement is that the potential enhancement that you would have faced, and that the government had alleged in the - - we would have been trying the case to would have had a mandatory minimum sentence of 15 years, and that has been bargained away by the government and is no longer relevant. (Transcript Rearraignment/Plea Hearing, pp.14- 15.)

Second, Campbell's objection is based on the recent decision of the Supreme Court in ***Wooden v. United States***, 142 S. Ct. 1063 (2022). The Supreme Court held that ten burglaries committed over the course of a single night in adjoining storage units were not offenses "committed on occasions different from one another" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). In so holding, the Court rejected a rule that offenses committed sequentially necessarily occur on different occasions. Instead, the Court held that the different-occasions inquiry "is more multi-factored in nature": "Offenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion; not so offenses separated by substantial gaps in time or significant intervening events. Proximity of location is also important; the further away crimes take place, the less likely they are components of the same criminal event. And the character and relationship of the offenses may make a difference: The more similar or intertwined the conduct giving rise to the offenses—the more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion." ***Wooden***, 142 S. Ct. at 1070-71.

The Court in **Wooden** expressly left open the question "whether the Sixth Amendment requires that a jury, rather than a judge, resolve whether prior crimes occurred on a single occasion," 142 S. Ct. at 1068 n.3. Further, the United States Solicitor General has determined that—in light of the "multi-factored" and "holistic" inquiry now required by **Wooden**, *id*. at 1068, 1070-71, as well as questions at oral argument and a concurrence focused on that issue—the government cannot defend the proposition that the different-occasions inquiry is a fact of a prior conviction that may be determined by the court.

On September 29, 2022, the Department of Justice provided guidance to all federal prosecutors that the government will take the position that a jury must find (or a defendant must admit) that a defendant's ACCA predicates were committed on occasions different from one another. Consistent with the Department of Justice's longstanding position regarding similar Sixth Amendment issues, if a jury did not find or the defendant did not admit that at least three of the defendant's ACCA predicates were committed on occasions different from one another, prosecutors may not seek imposition of an ACCA mandatory minimum sentence. There was no jury herein and Campbell did not admit that at least three of her ACCA predicates were committed on occasions different from one another.

In this case, Count Two of the Superseding Indictment did not allege that before Campbell committed a violation of 18 U.S.C. § 922(g)(1), she had at least three previous convictions for offenses committed on occasions different from one

5

another.

For these reasons, Campbell's position is that 18 U.S.C. § 924(e) and USSG § 4B1.4 are not applicable.

## Acceptance of Responsibility

Contrary to what the Government contends, since undersigned counsel has represented her, Campbell has always been ready to plead guilty.  This willingness was repeatedly communicated to the Government by undersigned counsel.

The hang-up / barrier to her pleading guilty was the Government's insistence that BOTH Defendants plead guilty at the same time.   Therefore, until the Government had an offer on the table that Defendant Smith was willing to plead to, Campbell was foreclosed from admitting her responsibility and pleading guilty.

Campbell should not be penalized because of the procedural box that the Government created and placed her into.

Further, the Government could have made the offer that Smith ultimately accepted, at any time.  Campbell is not to be faulted because the Government delayed making the offer that was ultimately accepted.

## Other Factors Relevant To Acceptance Of Responsibility

Attached hereto and incorporated by reference, for all purposes, is the Report of Matthew L. Ferrara, Ph.D., regarding Ms. Campbell and her mental state.

Campbell is psychologically vulnerable—a fact taken advantage of by Smith. Campbell believes that she is married to Smith, even though she is and has been

married to another man, without that marriage having been terminated.

In many ways, the defendants can be compared to Bonnie and Clyde with Smith being the Clyde of the relationship—committing the burglaries and making Campbell be the getaway driver, and requiring her to pawn the goods that he had stolen. Just as Clyde took advantage of Bonnie, Smith took advantage of Campbell. And, due to her fragile psychological state, Campbell cannot really be called a fully voluntary participant in the crime spree orchestrated by Smith.

To the extent that Campbell was manipulated into participating in the crimes, this should go to mitigate her responsibility. And it should be taken into consideration in the determination of whether or not she has properly accepted her responsibility.

### Downward Departure Requested And Warranted

Because of her fragile psychological state, her willingness to plead guilty, and the ways in which Smith took advantage of     and manipulated her, Campbell asserts that a downward departure is warranted. Campbell requests that her sentence be limited to five years.

Campbell also requests that the Court not impose a term of supervised release.

### 18 U.S.C. § 922(k) Is Unconstitutional

Campbell makes a facial challenge to Section 922(k). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act

would be valid." ***United States v. Salerno***, 481 U.S. 739, 745 (1987).

Until recently, federal courts uniformly applied at least intermediate scrutiny to firearms laws and conducted a means-end analysis to determine whether the state's interest in the regulation was sufficient to overcome whatever burden the law placed on one's Second Amendment right. *See, e.g.*, ***United States v. Carter***, 669 F.3d 411 (4^(TH) Cir. 2012). In ***Bruen***, however, the Supreme Court of the United States determined that all of the lower courts had been incorrect in applying means-end scrutiny. ***N.Y. State Rifle & Pistol Ass'n v. Bruen***, 142 S. Ct. 2111 (2022). Rather than balancing any government interest, no matter how important the interest may be in our modern society, the Supreme Court reaffirmed what it said in Heller: "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* (quoting ***District of Columbia v. Heller***, 554 U.S. 570, 634–35 (2008)) (emphasis in original). Because the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional then can be constitutional now.

As other districts have recognized, "***Bruen*** transformed and left uncharted much of the legal landscape." ***United States v. Charles***, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *1 (W.D. Tex. Oct. 3, 2022). Nevertheless, the Supreme Court provided the following mandate:

> In keeping with ***Heller***, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the

government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

***Bruen***, 142 S. Ct. at 2126 (internal citations omitted).

The Second Amendment to the United States Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In moving to dismiss, Campbell argues that the conduct prohibited by 18 U.S.C. § 922(k) is protected by the plain text of the Second Amendment and was unregulated in 1791. Relying on the Supreme Court's holding in ***Bruen***, Campbell argues that the statute is facially unconstitutional.

**18 U.S.C. § 922(k)**

Section 922(k) states, in pertinent part,

It shall be unlawful for any person knowingly to transport . . . in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess . . . any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(k).

The threshold question is whether Section 922(k) prohibits conduct that is protected by the plain text of the Second Amendment. *Bruen*, 142 S. Ct. at 2126.

It is to be expected that the Government will argue that it does not because the requirement that firearms bear serial numbers is, in its view, a "commercial regulation" that does not "infringe" on one's right to keep and bear arms.

In his concurring opinion in *Bruen*, Justice Kavanaugh explained that the Court did not intend "to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms". *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). This idea is rooted in *Heller* and *McDonald*—precedent that *Bruen* reaffirmed—which also left commercial regulations untouched. 554 U.S. at 626–27; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). This makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession.

Importantly though, the statute at issue here is not a commercial regulation. Rather, 18 U.S.C. § 923(I) is the commercial regulation that requires manufacturers to place serial numbers on firearms: "Licensed importers and manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon . . . each firearm imported or manufactured by such importer or manufacturer."

Other commercial regulations may well require that any firearm sale only

involve firearms bearing a manufacturer's serial number. Section 922(k) goes farther. It criminalizes the mere possession of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce.

Assume, for example, that a law-abiding citizen purchases a firearm from a sporting goods store. At the time of the sale, that firearm complies with the commercial regulation that it bear a serial number. The law-abiding citizen takes the firearm home and removes the serial number. He has no ill intent and never takes any otherwise unlawful action with the firearm. Section 922(k) amounts to an "infringement" on the law-abiding citizen's Second Amendment right because , the practical application is that while the law-abiding citizen's possession of the firearm was originally legal, it became illegal only because the serial number was removed. He could be prosecuted federally for his possession of it. That is the definition of an infringement on one's right to possess a firearm.

Now, assume that the law-abiding citizen dies and leaves his gun collection to his law-abiding daughter. The daughter takes the firearms, the one with the removed serial number among them, to her home and displays them in her father's memory. As it stands, Section 922(k) also makes her possession of the firearm illegal, despite the fact that it was legally purchased by her father and despite the fact that she was not the person who removed the serial number. These scenarios make clear that Section 922(k) is far more than the mere commercial regulation. Rather, it is a

11

blatant prohibition on possession. The conduct prohibited by Section 922(k) falls squarely within the Second Amendment's plain text.

Section 922(k) does implicate conduct that is protected by the Second Amendment. The statute is therefore presumptively unconstitutional unless the Government can show that "it is consistent with the Nation's historical tradition of firearm regulation." ***Bruen***, 142 S. Ct. at 2130.

## Conclusion

Campbell requests that the Court impose a five-year term of imprisonment in this case, followed by no term of supervised release. Campbell also requests that no special assessment be imposed and no fine assessed. The sentence requested is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of 18 U.S.C. § 3553(a).

The sentence requested will protect the public from further crimes of the defendant, afford adequate deterrence to criminal conduct, reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Campbell also requests that the Court find that 18 U.S.C. § 922(k) is unconstitutional, for the reasons set forth above.  Campbell prays for general relief.

Respectfully submitted,

/s/ Leonard Thomas Bradt

_____

Leonard Thomas Bradt #02841600

12

14090 Southwest Freeway, Suite 300
Sugar Land, Texas 77478
(281) 201-0700
Fax: (281) 201-1202
ltbradt@flash.net
Attorney for Brandi Campbell

## CERTIFICATE OF SERVICE

I certify that on November 8, 2022, a true and correct copy of the foregoing was served on the Government's counsel, AUSA Sharon Pierce, by e-service via PACER.

/s/ L.T. "Butch" Bradt
Leonard Thomas Bradt

**Matthew L. Ferrara, Ph.D.**
Clinical and Forensic Psychology
4833 Spicewood Springs Road
Suite 101 Austin, TX 78759
Tele: 512-708-0502 · Fax: 512-708-0557
mferraraphd@outlook.com

August 6, 2022

Leonard Thomas Brandt
14090 Southwest Freeway
Suite 300
Sugar Land, TX 77478

Dear Mr. Brandt,

Per your request, on 07-29-22 this examiner performed a mitigation assessment of Brandi Campbell (DOB: 08-02-72). A mitigation assessment is designed to determine if an individual has any personal characteristics or life experiences that would merit that individual receiving less severe punishment. Mitigating factors are not exculpatory, i.e., mitigating factors are not relevant for determining guilt or innocence. Rather, mitigating factors are relevant to making sentencing and punishment decisions.

There are two categories of mitigating factors: life experiences and personal characteristics. Life experiences that typically qualify as mitigation include events and experiences which took place during the individual's childhood, adolescent or early adulthood. These experiences become mitigating factors when the experience disrupts the development of the individual, such that the individual is not able learn and grow in a normal manner. Personal characteristics that are mitigating are those factors that pertain to an individual's health or mental health functioning, which reduce the individual's ability to reason, make logical decisions, and use good judgment.

When conducting the mitigation assessment, this examiner employed a standard forensic methodology that included a face-to-face meeting with Ms. Campbell, review of discovery, and psychological testing. The following summarizes this examiner's current opinions regarding Ms. Campbell.

1. **Reliability of Responses:** Response bias occurs when an individual consciously or subconsciously distorts his or her responses in a systematic manner. There are typically two types of response bias. First, there is positive response bias in which a person tries to appear more positive than he or she really is. For example, the individual tries to appear free of problems or shortcomings. This is the type of response bias one would expect when an individual is applying for a job. Second, there is negative response bias in which a person tries to appear more negative than he or she really is. For example, the person exaggerates or fabricates mental health symptoms. This is the type of response bias one would expect in an evaluation for criminal responsibility.

There are two subscales on the PDS. The Impression Management Scale measures the degree to which an individual consciously uses positive response bias to mislead others. The Self-Deception Enhancement scale measures the degree to which the individual subconsciously, or automatically, uses denial, so the individual can avoid recognizing personal problems and shortcomings. In this evaluation, the Paulhus Deception Scales (PDS) were used to determine if Ms. Campbell used any response bias when responding to questions about her current charges and her social history.

Ms. Campbell obtained a score of six (t-score = 50) on the Impression Management Scale and a score on zero (t-score = 44) on the Self-Deception Enhancement Scale. Based upon Ms. Campbell's PDS profile, it appears that she did not use any response bias. Individuals with a PDS profile like Ms. Campbell tend be aware of their problems. Their responses are not unduly influenced by what others may think of them. Individuals with this profile tend to be blunt and direct when responding to interview questions and their response to inventories are likely to be honest and valid.

2. **Health Problems:** When asked about her physical health, Ms. Campbell said that she has a small mass in her right breast, "It is a fatty tumor but I have a family history. They are keeping an eye on it. I also have a platelets disorder. My platelets are all different sizes. When it gets too low, they are talking about transfusions. I have arthritis in some of my major joints. Some of it is from ballet but I have been a competitive pianist since age 4. I could read music before I could read words. I have had two knee surgeries. I have heavier than normal periods. I went to see a physician and that is when I found out about my platelets. I get migraines and I got that when I fell off a ladder. I was putting up acoustic tile. The ladder went down. I went down too. I hit my head. I probably should have gone to the hospital. I just took off work."

3. **Mental Health Problems:** Ms. Campbell said that she was 10 years old, when she received mental health treatment for the first time, "My grades were not great in grade school. My mom and my dad took me to a psychiatrist, to figure out what was going. The psychiatrist didn't figure out anything. It was much later I figured it out, hindsight. I was bored. I was passing all my tests. All the in-class work was stellar. I refused to do homework. Things got easier the older I got."

Ms. Campbell said that when she was thirteen, she was in mental health treatment, "I went through a psychological exam. My first introduction to the MMPI. They diagnosed me with manic depression. I don't think that was accurate or maybe partial. I didn't like people my own age. I didn't like going outside. I was dancing but I was not athletic. I was socially awkward. From the time I started school, I was not like the other kids. They picked on me and bullied me. It was nonstop. I don't feel like I was brought up the way normal kids are. I feel my childhood was much more tightly restricted."

Ms. Campbell said that she had mental health treatment on and off from 15 to 17, "I put myself in foster care. I was back in therapy that point. Most of it was talk therapy, in a group setting. It was like hobby therapy, like crafts. Call it a day."

Ms. Campbell said that after age 17, she did not receive mental health treatment until age 39, "It was my first time on the wrong side of the law. I was locked up and going crazy. I asked to see somebody. I have always been in some form of mental health treatment since then. I was diagnosed and got medication. Medication has mostly been in Carswell. When I was released from Carswell, I had therapy as an outpatient. The medications were losing effectiveness. The second time I came out from Carswell I stopped taking medication. I

didn't feel much different. I started medicating in other ways. I have always been functional. I was taught that in my childhood, Whatever you got going on inside, you don't show it outside and you get the job done."

When asked if any of the treatment worked, "When they put me on Lamictal for racing thoughts, it absolutely stopped all my thoughts. I felt slow and stupid. I had them take me off. Celexa was good for controlling my depression. In 2017, I got off Celexa. Now, I'm on Lexapro and Amitriptyline (both medications are antidepressants but from different drug groups). It is working. My moods are level. I don't think I can cry. My anxiety is still up and down."

Ms. Campbell said she has tried suicide five times, "The first three were when I was fifteen. I was abandoned by my mother. We were not touchy feely but for mom to come out and say that kind of thing, it was too much. The first time, I tried to cut my wrists. I didn't get deep enough. The second time I tried to hang myself in the closet. The rod broke. I made some antifreeze with my home chemistry set. All it did was hurt my kidneys. I have two other attempts. In 2012, I tried to get a gun and shoot myself. I thought things were spiraling out of control. They were. A lot of that was cocaine induced. I got a hold of a gun. I thought of shooting myself. We were at a hotel room. I went outside and was going to do it in a ditch. I didn't want to mess up the room. Donavan caught up with me. In 2018, we were at the Oasis on the third level. I was paranoid and hearing things. I took a run and was going to jump off. He caught me in mid-air."

When asked if she ever received treatment after any of her suicide attempts, Ms. Campbell said, "I was not hospitalized. I never got any mental health treatment." Ms. Campbell said that she does get suicidal thoughts, "I do think about it a lot, like in one of those swings when I'm having trouble coping. I'm thinking about people I hurt. I do have a plan in the event that I get that far again." When asked what would get her to the point of suiciding, Ms. Campbell said, "If I had no useful purpose anymore. My useful purpose right now...I have been in a holding pattern for the last ten years. I think it is getting stuck in a dead-end job."

4. **Family of Origin Instability:** When asked about her upbringing, Ms. Campbell said, "My biological father was out of the picture by the time I was three. He came back when I was 19. He stayed with my aunt and uncle for a month. I was pregnant. I would walk over there. Apparently, my labor, I was standing up in bed and screaming at everyone. He left. I have not seen him since. Apparently, he had a restraining order but when my sister turned 18, he showed up."

When asked about being raised by her mother and adoptive father, Ms. Campbell said, "I didn't know any other dad except for him. He was authoritarian. Most of my memories are pain filled. I see pictures of me when I was four or five. The only memories I have are traumatic. He was a Marine, so I was do it this way or get hurt. Before mom went back to school, I don't recall her personality. They both went back to school and got their CPAs. She is driven. In her professional life, she is the boss. Mom worked private accounting. Dad worked public accounting. My dad was either studying or watching TV. He was that scary guy. Wait till your dad gets home were scary words."

Ms. Campbell said she was physically abused regularly, "It got fun when I was 13 and that therapist said that I was too old to spank. My dad would come in with a ream of paper and said write this sentence (on every page). There was no way I could do it. Then there was spankings and beatings. I broke the paddle. He had a 1 x 4, or it was thicker. Every couple of hours after I didn't have that packet done, it was the same thing over and over. Mom was out there in the living room, not helping, not commenting. He did not treat my sister like this. I was responsible for everything my sister did. My sister was sneaking out and writing checks, when she was 12. We had an adversarial relationship at best, when we were growing up. She has a methamphetamines habit. In 2007, she got a three-year sentence for embezzlement and methamphetamines. I guess she is on the straight and narrow. We get along better."

When asked why she put herself in foster care at age 15, Ms. Campbell said, "I finally got tired of the emotional abuse and being regularly beaten. There were marks left. I had a couple of scars. It centered all around my father. My mom came to me and said I don't know what it is between you and your father but if I had to choose, I would choose your father. I ran away and tried to kill myself three times. Then I put myself in foster care."

Ms. Campbell said, "My mom remarried and her husband started hitting on me. That is always fun. I was living with her and him after I got out of prison."

5. **Education:** Ms. Campbell said, "I didn't graduate high school. I had my first boyfriend when I was fifteen. They put me in a Christian School. My mom divorced my dad. I went back with mom. I didn't have enough credits, so I got my GED. I had a 3.4 GPA. I got two associates degrees, in music with instrumental specialties and education. Piano was my instrument. I had to practice 2 hours a day. If the lesson didn't go well, there was punishment. If competition didn't go well, there was punishment."

6. **Substance Use Disorder:** Ms. Campbell said, "I started drinking at about 16. I would go on a date, get trashed and go back to the halfway house. My usage of alcohol varied, from heavy to light. Sometimes I drank more or less. My first husband was Hispanic. I was expected to stay home and take care of the kid. After I got out of that marriage, I didn't drink at all. It started creeping back in. When I was in school, I was drinking more. I was attending music classes, choir and band. I would get up, get the kids ready for school, and go to work. I would get out of work and go to rehearsals, and I started drinking, so I didn't have to deal with husband number 2. The first time I used drugs was 2012. (around the time she met her codefendant). It was an area I didn't have knowledge in. I was looking to fill those gaps. I started doing meth, snorting it. It didn't do anything for me. I injected it. I spent the next 24 hours awake. Cocaine, I got into that. I was also introduced to heroin and higher-grade marijuana. I used Xanax, tiny amounts, so I could sleep. It was not a habit. Then in 2012, we got arrested in May. I didn't use again until 2017. I was not locked up that whole time. I got out in 2015. I lived with Donovan's mom. I worked at Sonic and Chili's. I violated for contact with Donovan. I was writing and sending money. He would call. I was locked up for 9 months. I hadn't failed a UA. I attended every class. I got out and didn't use but I started drinking to cope and used cocaine. I went to Ft. Worth, to cope with the violation. I got out and lived with Donovan's grandmother, who had strokes. I worked at a convenience store. Ten months in I got the new charge, felon in possession of firearm."

7. **Relationship History**: When asked about her relationship history, Mr. Campbell said, "I was married twice. My first husband was when I was a teenager. He drank a lot but not like teenage stuff. He was four years older. I thought I loved him. He was the first guy to make my parents mad. We had a son. My second husband was solid and stable. He was safe. We had two children, two girls. I was a stay-at-home mom. I was never meant to be a stay-at-home mom. When I went to school, I found out I had friends. I grew but not in a sympathetic manner. I want to say I needed a stronger man. He was quiet. My first job I landed, I was making more than him. My second marriage is not over. He said no (to divorce). I have tried to file four times from Carswell. Two were lost. I filed once from Texas. His response was no. The fourth time I filed was from Carswell but I got released. I have been out of that house with my second husband since 2012. I have been with Donovan since 2012. I met him on my first job, a computer instructor at a New Mexico State Prison. I had an inmate assistant for all of my classes. He was my third. He was a musician, too. It is hard to find anybody who could relate to the musician brain. It is hard to find someone who speak music. He would ask questions. I would supply answers. When things got serious, I quit the prison work. I worked at a Casino, as an IT tech."

8. **Overall Opinion:** Ms. Campbell was not arrested as an adult, prior to 2012. She did not use heavy drugs, until 2012. So, what happened in 2012 that caused this dramatic change? The answer is that she formed a relationship with her codefendant, who she met while she was working in prison and he was in custody.

   This examiner is not laying any blame on Ms. Campbell's codefendant for her poor choices and illegal behavior. Ms. Campbell's choice of forming a relationship with her codefendant is the result of the abuse and neglect she suffered in childhood.

   Ms. Campbell was abandoned by her biological father, when she was a toddler. Ms. Campbell was physically and emotionally abused by her adoptive father, to the point that she ran away from home. Ms. Campbell was emotionally abandoned by her mother, who let her adoptive father beat her and use other forms of harsh discipline. All of this caused Ms. Campbell to develop a chronic, if not lifelong, depression and low self-esteem. By the time she reached adulthood, it was inevitable that she would choose to have relationships with men who were psychologically damaged and who would damage her. In this context, Ms. Campbell chose to have a relationship with her coactor but it could have been any other damaged, dysfunctional man. This is why it is not her coactor's fault she committed crimes. She chose her partner and she chose to do what her partner was doing.

   Ms. Campbell's problem is that her upbringing broke her picker, i.e., her upbringing taught her to pick dysfunctional men as partners. Fortunately, there is treatment for this problem. It is recommended that Ms. Campbell participate in individual and group therapy, where she can address her upbringing and flawed manner in which she picks intimate partners. She should also read books on healthy relationships. Empirically based books written by John Gottman, Ph.D., would be a good place to start.

   Those working with Ms. Campbell should view her as a chronic moderate risk for suicide. She tends to think about suicide a lot, which increases her suicide risk. Those working with Ms. Campbell should monitor her risk for suicide and respond appropriately when increases in her suicidality are detected.

**Limitations of Opinions**

This examiner's findings include such things as his opinions, judgments, diagnoses, predictions, and conclusions. The findings contained in this report are based upon this examiner's professionally derived knowledge, including his knowledge of relevant scientific studies. This examiner has the appropriate education, training, and experience to offer the opinions contained in this report. The issues addressed in this report, and the techniques used to address these issues, are within this examiner's competence. All information that provides the basis for the findings is included in this report.

This examiner is familiar with the assessment techniques utilized as the basis of this report. This examiner administered, scored, interpreted and utilized assessment techniques, tests, and instruments in the manner and purpose for which there is a professional or scientific basis. No findings are based upon tests or measures that are obsolete or not useful for the current purpose.

The findings in this report are conservative and do not extrapolate beyond the available information. This examiner offers the findings in this report based upon reasonable psychological certainty. Findings that are not based upon reasonable psychological certainty were not included in this report.

This examiner is not offering an opinion about the psychological characteristics of any individual she did not examine. If there are comments in this report about the psychological characteristics of anyone this examiner did not examine, those comments were offered by the individual this examiner evaluated or derived from the materials reviewed and this examiner is merely reporting these comments without endorsing them.

By signing and dating this document, this examiner verifies that the opinions and findings in this report are reliable and valid. The opinions and findings in this report are based upon available information and techniques employed. The information and techniques are sufficient to provide appropriate substantiation for the findings. Should additional relevant information become available, this examiner would review this information and amend his report accordingly, at the request of the referral source.

Sincerely,

Signed Electronically: /s/ *Matthew L. Ferrara, Ph.D.*

## Methodology

- <u>Contact with Ms. Campbell</u>:
  - ➤ Clinical Interview
  - ➤ Social History
  - ➤ Mental Status Exam
- <u>Psychological Testing</u>:
  - ➤ Psychopathic Personality Inventory - Revised
  - ➤ Personality Assessment Inventory-
  - ➤ Revised Adult Attachment Scale
  - ➤ Barratt Impulsivity Scale
- <u>Materials Reviewed</u>
  - ➤ United States District Court for the Western District of Texas Presentence Investigation Report re: Ms. Campbell by Cicely R. Bennett Docket No. 0542-1:19CR00213-002 (05-03-22)
  - ➤ United States District Court for the Western District of Texas Superseding Indictment Cause No. A 19CR00213-RP

## Psychosexual Assessment Findings

**Risk for Being a Psychopath**: In an effort to determine if Ms. Campbell was a psychopath, she was administered the Psychopathic Personality Inventory-Revised. The PPI-R is a 154-item objective psychological test designed to identify psychopathic individuals. The PPI-R was subjected to rigorous validation studies, which showed that it does a good job discriminating psychopathic individuals from non-psychopathic individuals. The PPI-R was also found to be consistent, i.e., an individual's score did not vary over time total score (alpha coefficient = .86 to .93). Research on the PPI-R has been published in peer review journals. The PPI-R has been referred to in peer reviewed journals as "*the gold standard self-report psychopathy measures.*" The PPI-R is widely accepted among mental health professionals who conduct assessments designed to identify psychopathic individuals.

The PPI-R rating of an individual is based upon converting raw scores to t-scores. T-score at or above 65 are indicative of psychopathy. Below are Ms. Campbell's t-scores for the factor scales and total scale. All of Ms. Campbell's t-scores are well below the cutoff score of 65, so Ms. Campbell cannot be classified as a psychopath.

|  | t-score | Percentile Rank |
|---|---|---|
| Total Scale Score | 37 | 14% |
| Self-Centered Impulsivity | 47 | 38% |
| Fearless Dominance | 36 | 9% |
| Cold-heartedness | 39 | 17% |

**Personality Assessment Inventory.** The Personality Assessment Inventory (PAI) is an objective psychological test designed to measure personality, mental health problems, and emotional disorders. The PAI also provides information about substance abuse, self-concept, relationship style, and treatment readiness. The 344 items on the PAI are written at the elementary school level. The PAI has been subjected to rigorous empirical testing and the results of these studies are published in peer reviewed journals. The results show good convergent validity with other personality tests. The PAI has 22 nonoverlapping scales: 4 validity scales, 11 clinical scales, 5 treatment scales, and 2 interpersonal scales. The PAI is widely accepted in such settings as treatment planning, court, crisis intervention, personnel selection, pain management, and child custody.

Ms. Campbell's PAI clinical profile is marked by significant elevations across a number of different scales, indicating a broad range of clinical features and increasing the possibility of multiple diagnoses. The configuration of the clinical scales suggests a person with significant tension, unhappiness, and pessimism. Various stressors (both past and present) have adversely affected her self-esteem and she views herself as ineffectual and powerless to change the direction of her life. The disruptions in her life have left her uncertain about her goals and priorities, and tense and pessimistic about what the future may hold. She reports difficulties concentrating and making decisions, and the combination of hopelessness, anxiety, and stress apparent in these scores may place her at increased risk for self-harm.

Ms. Campbell is depressed. She is plagued by thoughts of worthlessness, hopelessness, and personal failure. She admits openly to feelings of sadness, a loss of interest in normal activities, and a loss of sense of pleasure in things that were previously enjoyed. She is likely to show a disturbance in sleep pattern, a decrease in level of energy and sexual interest, and a loss of appetite and weight. Psychomotor slowing might also be expected.

Ms. Campbell indicates that she is experiencing specific fears or anxiety surrounding some situations. The pattern of responses reveals that she is likely to display a variety of maladaptive behavior patterns aimed at controlling anxiety. She ruminates about matters to the degree that she often has difficulty making decisions and perceiving the larger significance of decisions that are made. Changes in routine, unexpected events, and contradictory information are likely to generate untoward stress. In addition, and perhaps related to the above problems, the respondent has likely experienced a disturbing traumatic event in the past-an event that continues to distress her and produce recurrent episodes of anxiety.

As a result of her upbringing, Ms. Campbell has significant suspiciousness and hostility in her relations with others. She is a hypervigilant individual who often questions and doubts the motives of those around her. Although she may not describe herself as unduly suspicious, others are likely to view her as very sensitive and easily insulted in her interactions. As a result, her relationships with others are likely to be strained and may require an unusual degree of support and assistance in order to succeed.

Ms. Campbell describes herself as a socially isolated individual who has few interpersonal relationships that could be described as close and warm. She may have difficulty interpreting the normal nuances of interpersonal behavior that provide the meaning to personal relationships. Her social isolation and detachment may serve to decrease a sense of discomfort that interpersonal contact fosters.

Ms. Campbell has a generally negative self-evaluation that may vary from states of harsh self-criticism and self-doubt to periods of relative self-confidence and intact self-esteem. This fluctuation is likely to vary as a function of her current circumstances. During stressful times, she is prone to be self-critical and pessimistic, dwelling on past failures and lost opportunities with considerable uncertainty and indecision about her plans and goals for the future. Given this self-doubt, she tends to blame herself for setbacks and sees any prospects for future success as dependent upon the actions of others.

Ms. Campbell's interpersonal style seems best characterized as being very uncomfortable in social situations. She appears to have little interest in or need for interacting with others and likely takes a rather passive, submissive stance when dealing with others. This lack of interest and initiative may result in her being socially isolated, avoiding most social interactions rather than run the risk of being forced to make an active commitment to a relationship.

With respect to suicidal ideation, Ms. Campbell reports experiencing intense and recurrent suicidal thoughts at a level typical of individuals placed on suicide precautions. The potential for suicide should be evaluated immediately and appropriate interventions should be implemented without delay. Furthermore, concerns about her potential for suicide are heightened by the presence of a number of features, such as situational stresses, a lack of social support, and overuse of alcohol, that have been found to be associated with suicide risk. Although only a small percentage of individuals who entertain suicidal thoughts actually act upon them, a score in this range should be considered a significant warning sign of the potential for suicide, regardless of the levels of elevation on other scales. A careful follow-up regarding the

details of her suicidal thoughts and the potential for suicidal behavior is warranted, as is an evaluation of her life circumstances and available support systems as potential mediating factors.

Ms. Campbell's motivation for treatment is typical of individuals being seen in treatment settings, and she appears more motivated for treatment than adults who are not being seen in a therapeutic setting. Her responses suggest an acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. However, the nature of some of these problems suggests that treatment would be fairly challenging, with a difficult treatment process and the probability of reversals.

**Barratt Impulsivity Scale:** The Barratt Impulsiveness Scale (BIS) is a 30 item self-report instrument designed to assess the personality/behavioral construct of impulsiveness. Originally developed as part of a larger attempt to relate anxiety and impulsiveness to psychomotor efficiency, the BIS is arguably the most commonly administered self-report measure for the assessment of impulsiveness in both research and clinical settings. Over the last 50 years the BIS has significantly influenced the way that impulsivity is conceptualized in psychology and psychiatry.

Ms. Campbell obtained a score of 35 on the Barratt Impulsivity Scale. To be rated as having a problem with impulsivity, Ms. Campbell would need to obtain a score of 72, or higher. Ms. Campbell's score on the Barratt Impulsivity Scale indicates that she does not have any problems with impulsivity.

**Revised Adult Attachment Scale-Close Relationships Version:** Attachment style is set during an individual's childhood. An individual brings her attachment style to ever interpersonal setting. There are three attachment styles: (a) **Secure**: often referred to as the "healthy" attachment style because the individual with a secure style is comfortable building relationships and being independent; (b) **Anxious**. Individuals with this style tend to be worried that other people will harm them or be untrue, so they never fully commit to the relationship; (c) **Avoidant**. Individuals with an avoidant attachment style are never fully in the relationship because they reject closeness and prefer to be distant in relationships.

The RAAS is an 18-item measure of attachment styles. Created in the early 1990s, the RAASC has been widely researched and as a result, it is widely accepted. In empirical studies, the RAAS is known to have good reliability and validity. Below is a listing of Ms. Campbell's sores on all three of the RAAS scales. Comparison of her scores reveals that Ms. Campbell has a secure attachment style.

|  | Total Score |
|---|---|
| Secure | 1.20 |
| Anxious | 3.85 |
| Avoidant | 4.50 |

Ms. Campbell has an avoidant attachment style. Given her upbringing, this finding is not surprising. In this type of insecure attachment, the individual is counterdependent. Counterdependence looks a lot like independence except the person lacks the capacity to commit to a relationship. If they get close to someone, it is uncomfortable. They do a poor job

of understanding their partner and how to behave in an intimate relationship. They may accuse their partner of things that they think happened but actually didn't. Since they never really commit to a relationship, they can end their relationships easily. The person with the avoidant attachment views intimate relationships as a means to an end. They do not value closeness as much as they value their freedom.